**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-6427**

───────────────

JULIUS LAMART HODGES

Plaintiff − Appellant

v.

COL. PETER MELETIS, Superintendent, in their official capacity; CPT. ALLEN WEST, Inmate classification, in his official capacity; LT. WANDA CREIGHTON, Work Release Manager, in their official capacity

Defendants − Appellees.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  David J. Novak, District Judge.  (3:21−cv−00614−DJN−EWH)

───────────────

Argued:  March 19, 2024                    Decided:  July 23, 2024

───────────────

Before WILKINSON, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

───────────────

Affirmed as modified by published opinion.  Judge Richardson wrote the opinion, in which Judge Wilkinson and Judge Quattlebaum joined.

───────────────

**ARGUED:**  Rudolph Rosenmayer, WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri, for Appellant.  Sharon E. Pandak, PANDAK & TAVES, PLLC, Woodbridge, Virginia, for Appellees.  **ON BRIEF:**  Steven J. Alagna, Supervising Attorney, Noah Smith, Student Advocate, Roger Han, Student Advocate, Kay Groneck, Student Advocate, Appellate Clinic, WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri, for Appellant.

RICHARDSON, Circuit Judge:

In January 2021, the detention facility where Julius Lamart Hodges was incarcerated experienced a COVID-19 outbreak. While most inmates quarantined, Hodges volunteered to continue working in the kitchen. Though he does not allege that he contracted COVID-19 during this time, he claims that the facility's decision to permit him to volunteer—resulting in his exposure to the disease—constitutes cruel and unusual punishment under the Eighth Amendment. Like the district court, however, we find that Hodges's allegations don't state an Eighth Amendment claim. And since Hodges's complaint states no other viable claim, we affirm the district court's dismissal.

I.      **BACKGROUND**

A.      **Factual Background[1]**

In July 2020, Hodges was sentenced to two years' imprisonment for violating the terms of his probation. The Virginia Department of Corrections placed him at the Prince William-Manassas Adult Detention Center until he was released in July 2022. While he was incarcerated, prison staff encouraged Hodges to join the Detention Center's Work Force program, an inmate-employment program, by telling him that, after eighteen months

---

[1] This factual recital accepts as true the allegations in Hodges's complaint, as we are required to do when reviewing a dismissal under 28 U.S.C. § 1915(e)(2). *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). Of course, this does not mean we find that the facts are true; that's simply not the question before us.

2

in Work Force, Hodges would qualify for Work Release.[2]  Persuaded, Hodges signed up and began performing Work Force duties.

Soon after, the Detention Center suffered a COVID-19 outbreak that originated with non-inmate kitchen staff.  This led to a facility-wide quarantine from January 26 to March 6, 2021.  Hodges and other Work Force inmates, however, were given the option to either leave the Work Force program and quarantine with the rest of the inmates or continue as essential workers in the facility's kitchens.  Hodges and seven others elected to continue working.

Because of staffing issues caused by the quarantine, Hodges worked twelve-hour shifts every day for at least three weeks around the "outside staff who originally caused the COVID-19 outbreak" with no contact tracing.  J.A. 7.  Plus, he claims to have done the work of at least three people, as eleven inmates[3] did what normally took thirty-six to thirty-nine people to accomplish.  So Hodges complained about his working conditions to prison staff.  But his complaints fell upon deaf ears as he was told "to stop complaining" and that "this [was] what [he] signed up for."  J.A. 8.  He also lodged a formal grievance with the prison on February 14.  This led one official to apologize to Hodges, although the apology's specifics are unclear, and another to recognize that Hodges "may have worked more

---

[2] From the complaint, it appears that Work Force is employment supervised by the Detention Center, often involving jobs within the facility itself, while Work Release involves unsupervised employment out in the local community.

[3] Hodges first alleged that he and seven other inmates continued to work in Work Force during the quarantine.  J.A. 7 ("[T]he whole jail population was quarantined besides 8 Work Force inmates.").  He does not explain how the number of Work Force inmates increased to eleven.

consecutive days than [he] should" have.  J.A. 6.  But that second official also noted that Hodges did not have to continue working.

### B.    Procedural Background

On September 6, 2021, Hodges filed this § 1983 action against Detention Center officials Col. Peter Meletis, Cpt. Allen B. West, and Lt. Wanda Creighton seeking monetary and injunctive relief.[4]    The complaint asserted, among other things, that Defendants violated Hodges's Eighth Amendment rights by allowing him to work during an outbreak and violated his First Amendment rights by retaliating against him after he filed his grievances.  Hodges subsequently moved to proceed *in forma pauperis* ("IFP"), which the district court granted.  *See* 28 U.S.C. § 1915.  Then, as required by § 1915(e)(2) and § 1915A, the district court preliminarily reviewed Hodges's complaint.  The court dismissed Hodges's Eighth Amendment claim for failure to state a claim upon which relief could be granted and for being legally frivolous.  It also held that Hodges failed to plausibly allege that Defendants retaliated against him in violation of the First Amendment.

Hodges timely appealed.  We granted him leave to appeal IFP and ordered that he comply with § 1915's fee-payment provisions.  Yet Hodges failed to comply with that order for June 2022, the month right before his release.  Hodges has not remedied that failure, nor has he made any more fee payments.

---

[4] Though Hodges's complaint named Defendants only in their official capacities, the district court liberally construed Hodges's claim for damages as running against Defendants in their individual capacities. *Hodges v. Meletis*, No. 3:21CV614 (DJN), 2022 WL 989016, at *4 (E.D. Va. Mar. 31, 2022).

4

## II.     DISCUSSION

Hodges primarily argues on appeal that the district court erred in dismissing his First and Eighth Amendment claims.  We disagree and thus affirm.[5]

### A.     We decline to dismiss Hodges's appeal for failure to comply with our order directing him to pay fees.

Before reaching this appeal's merits, we address Defendants' argument that we should dismiss Hodges's appeal because he failed to make his June 2022 fee payment as required by both our order and the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915.  While we have that power, we decline to exercise it in this case.

In order to bring cases in federal courts, prospective litigants must pay a filing fee.  *See* 28 U.S.C. § 1913 (courts of appeals); § 1914 (district courts).  And ordinarily, the plaintiff or appellant must pay the fee at the beginning of a lawsuit or appeal or face dismissal.  *See, e.g.*, *Dupree v. Palmer*, 284 F.3d 1234, 1236 (11th Cir. 2002) (per curiam);

---

[5] Defendants preliminarily argue that Hodges's release from confinement moots this appeal.  We have routinely held, however, that transfer or release from a prison facility moots only claims for injunctive or declaratory relief.  *E.g.*, *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).  A claim for monetary damages, on the other hand, is not mooted by a transfer or release.  *Id.*  Accordingly, while Hodges's claims for injunctive relief are moot, we maintain jurisdiction over Hodges's claims for monetary relief.

In connection with this argument, Defendants submitted a motion to file the affidavit of Lt. Jeffrey Kepler, which included five attachments.  We deferred decision pending oral argument and now grant the motion in part and deny in part.  We grant the motion as to Attachments A, B, and C, as they establish that Hodges has been released from prison and are thus probative of jurisdictional facts.  *Cf. United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009).  But we deny the motion as to the remaining attachments because they exist merely to attack certain factual allegations and inferences stemming from Hodges's complaint.  When ruling on a motion to dismiss, we are limited to the complaint.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).  So we do not consider those attachments.

*Hall v. United States*, 44 F.4th 218, 239 n.10 (4th Cir. 2022) (Richardson, J., concurring in the judgment).  For indigent parties, however, requiring prepayment might deny them meaningful access to federal courts.  To address this problem, Congress passed the federal *in forma pauperis* ("in the manner of a pauper") statute, which permits federal courts to waive the prepayment requirement.  *See* 28 U.S.C. § 1915(a)(1).

Still, at least for prisoner IFP plaintiffs, the statute is clear that IFP plaintiffs must still "pay the full amount of a filing fee."  § 1915(b)(1).  But while IFP prisoners aren't relieved from paying the full fee, they are relieved from the *prepayment* obligation.  Instead, the IFP statute parcels the prisoner's fee into smaller amounts to be paid over time.  First, prisoners must make an initial payment "when funds exist"[6] comprised of "20 percent of the greater of" either "the average monthly deposits into the prisoner's account" or "the average monthly balance in the prisoner's account" over the last six months.  *Id.*  Then, following the initial payment, prisoners are "required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account . . . until the filing fees are paid."  § 1915(b)(2).  So § 1915(b) essentially puts indigent prisoner plaintiffs on installment plans for their fees, with their monthly payments pegged to twenty percent of their monthly income.

When prisoners fail to make their monthly payments, they risk dismissal as a sanction.  In federal appellate courts, Federal Rule of Appellate Procedure 3(a)(2) provides

---

[6] This language is a corollary to § 1915(b)(4), which states, "In no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee."

that "[a]n appellant's failure to take any step other than the timely filing of a notice of appeal . . . is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal." *Cf.* Fed. R. App. P. 3(e) ("Upon filing a notice of appeal, the appellant must pay the district clerk all required fees."). So "failure to comply with any of [§ 1915's] requirements may result in dismissal of a prisoner's action." *See, e.g.*, *In re Smith*, 114 F.3d 1247, 1251 (D.C. Cir. 1997); *Larson v. Scott*, 157 F.3d 1030, 1032 (5th Cir. 1998); *Cosby v. Meadors*, 351 F.3d 1324, 1326 (10th Cir. 2003). In this case, Hodges failed to make one required monthly payment—his June 2022 payment. Accordingly, we may dismiss Hodges's appeal or impose some other sanction.[7]

That said, sometimes a court's failure to receive payment will not warrant dismissal. Normally, it is the prisoner's custodian, not the prisoner himself, who must make monthly payments. § 1915(b)(2) ("The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court . . . ."). So a prisoner, through no fault of his own, may miss payments because the jail or prison has failed to submit his payment. *See, e.g.*, *Hatchet v. Nettles*, 201 F.3d 651, 652 (5th Cir. 2000) (per curiam). Courts thus generally inquire into why payments were missed before dismissing an appeal. *Id.*; *Wilson v. Sargent*, 313 F.3d 1315, 1321 (11th Cir. 2002). And if the missed

---

[7] Because the PLRA's language gives no indication that its fee provisions are jurisdictional, we are not required to dismiss his appeal. *Cf.* Fed. R. App. P. 3(a)(2); *Harrow v. Dep't of Def.*, 144 S. Ct. 1178, 1183 (2024) (explaining that a procedural rule is "jurisdictional only if Congress 'clearly states' that it is" (quoting *Boechler v. Comm'r*, 596 U.S. 199, 203 (2022)).

payment was not a result of the defendant's noncompliance, dismissal is inappropriate. *Wilson*, 313 F.3d at 1321; *see also Hatchet*, 201 F.3d at 652.

The record here, however, reveals why Hodges missed his monthly payment: He spent his money on things other than his court fees. He earned $210 dollars in June 2022 yet withdrew $192.15 for various commissary purchases. That left him with only $17.85. But under § 1915(b)(2) and our court order, Hodges was obligated to keep at least $42 (twenty percent of $210) in his prison account to pay the fee. Because he had inadequate funds in his account, the prison could not forward his required fee payment to the court. Thus, Hodges's failure did not stem from "circumstances beyond his control, in which case his complaint should not be dismissed." *Wilson*, 313 F.3d at 1321. Rather, his failure followed from his own actions. So we could dismiss Hodges's appeal.

Even so, we will not dismiss Hodges's appeal for failure to pay his fees. Hodges missed only a single payment, timely submitting all other required fee payments until June 2022. And Hodges's release from prison the next month—while his appeal was pending— meant that he no longer accrued monthly fee obligations under the PLRA. As we have held, "the PLRA fee requirements are not applicable to a released prisoner (assuming the prisoner made any required payments while in prison)." *DeBlasio v. Gilmore*, 315 F.3d 396, 397 (4th Cir. 2003); *Torres v. O'Quinn*, 612 F.3d 237, 244 n.7 (4th Cir. 2010), *abrogated on other grounds by Bruce v. Samuels*, 577 U.S. 82 (2016) ("[A] released prisoner who complies with the PLRA while incarcerated will not be bound to pay

outstanding fees after he is released.").[8]  When inmates are released, they do not "become instantly liable for the remaining filing fee balance simply because they have been released." *DeBlasio*, 315 F.3d at 399.  Instead, the court should "allow[] a released prisoner to apply to proceed under the general" IFP provision rather than the prisoner IFP provision. *Id*.  Here that means Hodges is no longer "bound" by the monthly requirements of § 1915(b), *Torres*, 612 F.3d at 244 n.7, outside of "any required payments while in prison," *DeBlasio*, 315 F.3d at 397.  He's treated like any other non-prisoner plaintiff granted IFP status under § 1915(a)(1) from the time he was released from prison.[9]

Because Hodges's obligation to pay monthly fees evaporated when he was released from prison, the only fee payment he missed was the June 2022 payment.  Thus, unlike many IFP plaintiffs who had their complaints dismissed, *see Cosby*, 351 F.3d at 1333–34, Hodges missed only one payment at the end of his prison sentence.  Yes, he is almost two years late.  But he is only late regarding one forty-two-dollar payment.  And given that we ultimately decide to affirm the district court on the merits, we decline to dismiss Hodges's appeal on this procedural ground.

---

[8] Not all circuits agree.  *See, e.g.*, *Gay v. Tex. Dep't of Corr. State Jail Div.*, 117 F.3d 240, 242 (5th Cir. 1997) (holding that a prisoner's release is "irrelevant" when § 1915's triggering event—the filing of a complaint or an appeal—occurred while the plaintiff was in prison).

[9] We have suggested that released prisoners should be allowed to "apply" under the general IFP provision.  *DeBlasio*, 315 F.3d at 399.  But Rule 24 specifies that parties who were granted IFP status below "may proceed on appeal in forma pauperis without further authorization."  Fed. R. App. P. 24(a)(3).  So rather than require Hodges to re-apply for IFP status, we allow him "to proceed . . . without further authorization."

**B.    Hodges's complaint fails to state viable Eighth Amendment or First Amendment claims.**

Moving to the merits, Hodges argues the district court erred by dismissing his complaint because it sufficiently alleges Defendants violated his Eighth Amendment and First Amendment rights.[10]  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).  We disagree.

We review a district court's dismissal for failure to state a claim under the PLRA *de novo*.  *De'Lonta*, 330 F.3d at 633.  The standard is the same as under Federal Rule of Civil Procedure 12(b)(6):  We ask whether, accepting all a complaint's well-pleaded allegations as true, it "state[s] a claim to relief that is plausible on its face."  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

**1.    Hodges's complaint does not state an Eighth Amendment claim for cruel and unusual punishment.**

The heart of Hodges's Eighth Amendment claim is that Defendants subjected him to cruel and unusual punishment during the COVID-19 lockdown when they allowed him to volunteer to work in the prison kitchens.

The Eighth Amendment provides that "cruel and unusual punishments [shall not be] inflicted."  U.S. Const. amend. VIII.  By its terms, the Amendment clarifies that it prohibits the Government from "*inflict[ing]*" "punishment" that is "cruel and unusual."  *id.*

---

[10]  Hodges also argues that the district court erred by dismissing his Eighth Amendment claim as legally frivolous.  *See* 28 U.S.C. § 1915(e)(2)(B)(i).  Because we affirm the district court's dismissal of that claim for failure to state a claim, we need not decide whether the claim is legally frivolous.  *Compare Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (explaining that a complaint is legally "frivolous where it lacks an arguable basis . . . in law"), *with De'Lonta*, 330 F.3d at 633 (explaining that a complaint fails to state a claim when the allegations, if true, wouldn't establish the plaintiff is legally entitled to relief).

10

(emphasis added). And "to inflict" is a transitive verb meaning "to apply" or "impose." 1 Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773); Noah Webster, *American Dictionary of the English Language* (1828). As a transitive verb, it requires a grammatical subject to exert some action upon an object. Robert Lowth, *A Short Introduction to English Grammer* 30 (1799); *see also* Bryan A. Garner, *Garner's Modern English Usage* 1035 (4th ed. 2016). So "infliction" requires an actor to "apply" or "impose" some action upon someone else. Furthermore, because the Eighth Amendment is a limitation upon the Government, *Austin v. United States*, 509 U.S. 602, 609 (1993), that actor must be the Government or its agents. Thus, by prohibiting the *infliction* of cruel and unusual punishment, the Eighth Amendment operates by limiting what the Government can do while applying or imposing punishment.

Historically, that limit has been interpreted to prevent physically barbarous punishments, such as torture. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). But "more recent cases" have established that the Amendment forbids punishments that "involve the unnecessary and wanton infliction of pain." *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). While we need not (and likely could not) give an exhaustive account of what constitutes "cruel and unusual punishment," the Supreme Court has also held that prison officials violate the Eighth Amendment when they fail to "provide humane conditions of confinement" by depriving inmates of life's necessities, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), such as "food, clothing, shelter, medical care, and

reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989)).

For a prisoner to assert that prison officials imposed conditions of confinement that deprive him of life's necessities, however, he "must prove two elements—that the deprivation [by prison officials] of a basic human need was *objectively* sufficiently serious, and that *subjectively* the officials acted with a sufficiently culpable state of mind." *Jones v. Solomon*, 90 F.4th 198, 208 (4th Cir. 2024) (quoting *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995)). Only then can the officials be charged with *inflicting* cruel and unusual punishment.

This case fails at the outset because Hodges fails to show that prison officials were responsible for depriving Hodges of anything, much less a basic human need like reasonable safety. *Helling*, 509 U.S. at 33, 35. Hodges *volunteered* to expose himself to the conditions he now challenges. Prison officials gave him a choice between quarantining or working. And he chose to work. So even if his choice to work exposed him to greater safety risks, the fact that he chose willingly and could have stopped at any time means that those officials did not *inflict* those risks upon him. *Cf. Helling*, 509 U.S. at 36 (asking "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone unwillingly* to such a risk" (emphasis added)).[11]

---

[11] Because we hold that Hodges's complaint fails to allege a deprivation by government officials, we need not address whether the alleged deprivation was objectively serious enough or whether the prison officials acted with a subjectively culpable state of mind. *See Farmer*, 511 U.S. at 834.

Taking a step back, it's clear why "conduct in which one voluntarily engages can hardly be said to violate the Eighth Amendment." *Haas v. Weiner*, 765 F.2d 123, 124 (8th Cir. 1985) (per curiam). Again, the Amendment prohibits "the unnecessary and wanton *infliction* of pain" by prison officials. *Estelle*, 429 U.S. at 102 (emphasis added) (citation omitted). And, in the prison setting, the Government can inflict pain both by affirmatively acting and by failing to act. *Helling*, 509 U.S. at 31. That's because "[w]hen the State takes a person into its custody and holds him there against his will," *DeShaney*, 489 U.S. at 199–200, it largely "incapacitates a prisoner to exercise ordinary responsibility for his own welfare," *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). So when prison officials take away or fail to provide some necessity, the prisoner himself has no other way to obtain it, and the officials have thus inflicted the deprivation of that necessity upon him.

Yet when an inmate *can* choose to avoid a particular condition or activity or has the means to secure his own necessities, he necessarily has the power "to exercise responsibility for his own welfare." *Id*. So, if the inmate exercises (or rather, abdicates) that responsibility by voluntarily exposing himself to a condition or activity, *prison officials* have not deprived him of any right or necessity. *See Helling*, 509 U.S. at 36. Rather, the prisoner has inflicted that deprivation upon himself. *See Legate v. Livingston*, 822 F.3d 207, 209 (5th Cir. 2016) (finding no Eighth Amendment claim based on an inmate's voluntary participation in a religious communal pipe-smoking ceremony from which he contracted a disease since "a prisoner cannot establish a violation where he willingly participates in the conduct giving rise to his injury").

13

For a concrete example, consider a simplified version of the famous Burt Reynolds movie, *The Longest Yard* (Paramount Pictures 1974).[12]   There, the protagonist, incarcerated football star Paul Crewe, builds a team of inmates to play in an exhibition football game against a semi-pro team of prison guards managed by the prison's warden. Motivated by a desire to beat the guards at their own game, many inmates voluntarily join the team.  But the team is forced to prepare in less-than-perfect conditions, practicing on a poorly kept field with outdated equipment (at least until they manage steal some uniforms from the guards).  And once game day arrives, a predictably rough game ensues.

These facts don't amount to an Eighth Amendment violation.  When an inmate is permitted to voluntarily participate in a sport, he, "like any cautious ballplayer outside of prison," has both the capacity and duty "to exercise responsibility for his own welfare" by, for example, "examin[ing] the playing field" and declining to play if he deems the risks too great.  *Christopher v. Buss*, 384 F.3d 879, 882–83 (7th Cir. 2004).  Should he fail to do so, that failure cannot then be laid at the feet of prison officials.  *Id.*; *see also Wronke v. Champaign Cnty. Sheriff's Off.*, 132 F. App'x 58, 61 (7th Cir. 2005) (per curiam) (unpublished) ("Wronke cannot manufacture a constitutional claim by volunteering for a job when he could have avoided the offending conditions by choosing to stay in his cell."). Because the inmate voluntarily put himself in the dangerous situation (either deliberately or inadvertently), the fact that prison officials merely allowed the inmate to make that choice cannot fairly be said to have *deprived* the inmate of reasonable safety.

---

[12] Or, for those a bit younger, consider Adam Sandler's 2005 remake.

Here, Hodges's complaint doesn't allege he was unwillingly exposed to the risk of COVID-19 any more than Paul Crewe was unwillingly exposed to the risk of football-related injuries. Before agreeing to work during the lockdown, Hodges and his coworkers were "given the option [to] either work as essential workers" or quarantine with the rest of the facility. J.A. 7. Nowhere does Hodges allege that his participation was mandated or that he could not choose to quarantine. In fact, he alleges that the staff affirmed that he "d[id] not have to remain" on Work Force if he was dissatisfied with the conditions.[13] J.A. 6. True, electing to quarantine would have resulted in his removal from Work Force and disqualification from Work Release eligibility. But Hodges had no constitutional entitlement to participate in Work Force or Work Release. *See Gaston v. Taylor*, 946 F.2d 340, 344 (4th Cir. 1991). So the Detention Center didn't condition any constitutional rights or basic necessities upon Hodges's participation. Additionally, "exercise[ing] ordinary responsibility for [one's] own welfare," *Lewis*, 523 U.S. at 851, often requires giving up some privilege one might otherwise have. So, yes, if Hodges had elected to quarantine, he

---

[13] Contrast Hodges's allegations to *Rish v. Johnson*, 131 F.3d 1092 (4th Cir. 1997). There we explained that "[a]lthough the inmates initially volunteered for the duty soon after their respective arrivals at F.C.I. Butner, they lacked a full understanding of exactly what the position entailed, and having once committed themselves to the task, they could not refuse to perform the requisite duties without suffering punishment. Accordingly, the inmates' duties as orderlies were not 'voluntary' in the sense that they could avoid the risks of which they now complain if they chose to do so." *Id.* at 1094 n.3. Hodges alleges neither that prison officials hid the risks nor that he could not quit once he began. *See Haas*, 765 F.2d at 124.

15

would have lost the privileges of Work Force. But that doesn't mean he kept working involuntarily. So Hodges has not sufficiently alleged a deprivation by prison officials.[14]

### 2. Hodges's complaint does not state a First Amendment retaliation claim.

Hodges's complaint also alleges that prison officials retaliated against him for having raised concerns about the working conditions. According to Hodges, he was denied Work Release as punishment for his protected complaining in violation of the First Amendment. But his complaint doesn't state such a claim.

A First Amendment retaliation claim requires a plaintiff to show that (1) his "speech was protected," (2) "the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech," and (3) "a causal relationship exists between [the plaintiff's] speech and the defendant's retaliatory action." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). Hodges asserts that he engaged in protected activity by filing grievances regarding his work conditions and that Defendants took adverse action against him by "foreclos[ing] Mr. Hodges's path to Work Release." Appellant's Br. 30–32. But Hodges has failed to allege a causal relationship between the two.

---

[14] This also sufficiently disposes of Hodges's other claim of cruel and unusual punishment—that he was subjected to impermissibly hard work and long hours. If Hodges didn't like the work and hours he was assigned, he didn't have to do it. So, just like he voluntarily chose to expose himself to the COVID-19 risk, he voluntarily chose to expose himself to the hard work and long hours. For similar reasons, we reject Hodges's separate allegation that it was cruel and unusual to have him do landscaping during the hot summer.

Hodges advances three arguments for why the allegations in his complaint satisfy the causation prong of a retaliation claim, but all fail. His first argument is that his complaint establishes causation because it alleges that the named Defendants (or at least Lt. Creighton) knew about his protected activity before taking adverse action against him. Yet Hodges's complaint alleges that he was denied Work Release in August 2020, before he began complaining, and again in May 2021. The first denial couldn't have been caused by Hodges's grievances because he hadn't made them yet. But even if we only consider the later denial of his request for Work Release, knowledge of protected First Amendment activity alone "'does not establish a causal connection' between the protected activity and the adverse action." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). Instead, a plaintiff must allege some additional evidence that can support an inference of causation.

This leads to Hodges's second argument—that his complaint sufficiently alleges causation because it alleges that Lt. Creighton's "campaign to block [Hodges] from Work Release began" "[s]hortly after Mr. Hodges filed his grievance." Opening Br. at 33.[15] To Hodges's credit, temporal proximity alone can create the inference of causation. *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017). But what dooms his argument is that we require "the temporal proximity [to be] very close." *Id.* "A lengthy time lapse between" the defendant learning of the protected speech and the defendant

---

[15] We assume, as Hodges has alleged, that Lt. Creighton, not the Department of Corrections, effectively denied Hodges's application.

taking the allegedly retaliatory action "negates any inference that a causal connection exists between the two." *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).[16]

Hodges's complaint alleges that he was denied Work Release for the second time in May 2021, when Hodges received a letter from Lt. Creighton informing him that the Department of Corrections had not approved his Work Release application. But the protected speech Lt. Creighton allegedly retaliated against Hodges for—his February 14, 2021, grievance—occurred three-and-a-half months earlier. We have expressly held that adverse action taken "three months after" a grievance "did not 'closely follow' a protected activity, and thus does not present a circumstance that courts have characterized as creating a strong inference of retaliation." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021); *cf. King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) ("King's firing came two months and two weeks following Carlson's receipt of notice that King [took protected activity]. This length of time between Carlson's notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events."); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("In this case, at least three to four months separated the [adverse action] and the claimed protected activities. We find that this time period is too long to establish a causal connection by temporal proximity alone."). So without more, Hodges's complaint fails to allege a First Amendment retaliation claim.

---

[16] Though *Dowe* is a Title VII case, we routinely use Title VII precedents in the First Amendment-retaliation context. *See Penley*, 876 F.3d at 656 (citing *Dowe*, 145 F.3d 653).

In hopes of saving his claim, Hodges points to his allegation of "Lt. Creighton's negative attitude towards" him. Opening Br. at 33. Even ignoring that Hodges's complaint alleges that said "negative attitude" started *after* the denial of his application, he cites no authority for his proposition that a "negative attitude" proves causation. And, in reality, it may prove the opposite. To state a claim, Hodges must allege that Lt. Creighton took adverse action *because of* protected speech. But Hodges's "negative attitude" argument actually provides an alternative reason for why Lt. Creighton might have denied Hodges's request—she just didn't like him. This might be grounds for a formal grievance or reprimand, but absent some showing that she didn't like him *because of* his speech, it doesn't establish causation.

All this is to say that the only allegations in the complaint that go to causation are Hodges's allegations of temporal proximity. But those alone are insufficient to plausibly allege causation. So the district court was correct to dismiss Hodges's claim.[17]

---

[17] Below, Hodges also sought to supplement his complaint by alleging new instances of retaliation that came after he filed his § 1983 action. Without explanation, the district court declined to consider Hodges's new allegations, which we construe as motions to file supplemental pleadings. *See* Fed. R. Civ. P. 15(d). Leave to supplement "should be freely granted, and should be denied only where 'good reason exists . . . , such as prejudice to the defendants.'" *Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (quoting *Walker v. United Parcel Serv.*, 240 F.3d 1268, 1278 (10th Cir. 2001)). Accordingly, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

That said, the refusal to consider Hodges's supplemental allegations was harmless. *See* 28 U.S.C. § 2111 ("[T]he court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). Hodges's supplemental allegations sought to assert two new factual scenarios involving First Amendment retaliation. The first involves an unnamed staff member opening (Continued)

*              *              *

The sum of the above is that Hodges failed to allege facts sufficient to state any viable claim. But determining that we will affirm the district court's dismissal leaves us with Hodges's final argument: that the district court erred by dismissing his complaint with prejudice. In support, Hodges correctly points out that we've suggested that "dismissal should generally be without prejudice" when "the district court neither gave [the *pro se* plaintiff] the opportunity to amend nor . . . engage[d] in any discussion as to why amendment would be futile." *King v. Rubenstein*, 825 F.3d 206, 225 (4th Cir. 2016). And Defendants, for their part, offer no rebuttal to this argument. So we will "modify the judgment only to the extent that the dismissal be without prejudice." *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 642 (4th Cir. 2016). As a result, the district court's order is

*AFFIRMED AS MODIFIED.*

---

Hodges's mail. But that does not allege that *Defendants* retaliated against him; it alleges the unnamed staff member did. *Suarez Corp. Indus.*, 202 F.3d at 686. The second allegation, which involves Lt. Creighton preventing another officer from writing Hodges a recommendation letter and removing him from Work Force, fails for the same reasons as Hodges's original retaliation claim—he doesn't sufficiently allege causation.